HARTZ, Circuit Judge.
Petitioner American Federation of Government Employees Local 1592 (the Union) seeks review of a decision of the Federal Labor Relations Authority (FLRA) in favor of the Department of the Air Force, Ogden Air Logistics Center, Hill Air Force Base, Utah (Hill Air Force Base or Hill). The FLRA rejected the Union’s claim that Hill committed an unfair labor practice when it denied the request of its then-employee Joseph Ptacek Jr. to have a union representative present during questioning by the Air Force Office of Special Investigations (AFOSI) about his misuse of a work computer. The claim rested on a provision of the Federal Service Labor-Management Relations Statute (the Labor-Management Statute), 5 U.S.C. § 7101 et seq., that provides federal employees who belong to a union with the right to the presence of a union representative when questioned about matters that could lead to discipline. See id. § 7114(a)(2)(B). The FLRA relied on President Carter’s Executive Order 12,171, *1293 which exempts AFOSI from coverage under the Labor-Management Statute. See 5 U.S.C. § 7103(b)(1) (granting President power to exclude certain kinds of agencies from coverage under the Labor-Management Statute). We have jurisdiction under 5 U.S.C. § 7123(a). Because § 7103(b)(1) and Executive Order 12,171 extinguished any right to have a union representative present during a proper AFOSI interrogation, we deny the Union’s petition.
I. BACKGROUND
A. The Investigation
The present dispute began in August 2007 when Ptacek, an employee of Hill Air Force Base and a member of the Union, was accused of viewing pornography on his work computer. One of his supervisors placed him on administrative leave while Hill’s information-technology department investigated the accusation. When that investigation indicated that Ptacek may have accessed child pornography, AFOSI, which investigates felony-level crimes for the Air Force, took over the investigation.
An analysis of Ptacek’s computer failed to find any stored child pornography, but it did reveal explicit search terms that may have referenced child pornography. At the request of AFOSI, one of Ptacek’s supervisors, Kenneth Williams, directed him to come to Hill Air Force Base for an interview with AFOSI. Ptacek agreed and arrived at the base accompanied by his union representative, Richard Thomas. Williams then drove Ptacek to the AFOSI building, with Thomas following in his own vehicle.
Ptacek asked the AFOSI special agent in charge of the investigation if Thomas could attend the interview as his union representative. The agent denied the request and interviewed him outside the presence of both Williams and Thomas. After the investigation concluded in January 2008, Hill proposed terminating Pta-cek’s employment. But further discussion persuaded it to allow him to keep his job, with the understanding that he would be terminated if he continued inappropriate use of the computer. About a month later, Ptacek again misused his computer. He resigned to avoid termination.
B. The Statutory Framework
The Labor-Management Statute provides a comprehensive framework for labor relations between the federal government and its employees. See 5 U.S.C. § 7101 et seq. (1978). It regulates employees’ rights to join a public-sector union, see id. § 7102; the formation and recognition of unions, see id. § 7111; collective bargaining, see, e.g., id. §§ 7117, 7119; and the rights and duties of management and unions, see, e.g., id. §§ 7106, 7113, 7114. It also identifies actions by either an agency or a union that constitute unfair labor practices, such as interfering with the rights granted by the statute, see id. § 7116(a)(1), encouraging or discouraging union membership by discrimination in conditions of employment, see id. § 7116(a)(2), or otherwise violating the statute, see id. § 7116(a)(8). The FLRA has authority to determine whether an unfair labor practice occurred, see id. § 7118, subject to judicial review by a federal court of appeals, see id. § 7123(a). The Labor-Management Statute provides a variety of remedies for unfair labor practices, including orders to cease and desist, orders to renegotiate a collective-bargaining agreement, orders to reinstate an aggrieved employee with backpay, or “such other action as will carry out the purpose of [the Labor-Management Statute].” Id. § 7118(a)(7).
Not all federal employees are covered by the Labor-Management Statute. The statute explicitly excludes certain agencies, such as the Government Accountability Office, the Federal Bureau of Investigation, *1294 the Central Intelligence Agency, and the Secret Service. See id. § 7103(a)(3). And “any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security” is barred from belonging to a union. Id. § 7112(b)(6). In addition, Congress provided the President with authority to exclude other agencies from coverage under all or some of the provisions of the statute. The President may suspend portions of the Labor-Management Statute for agencies and activities outside the United States if the President deems it necessary for national security. See id. § 7103(b)(2). Or, relevant here, the President may exclude an agency from the entire statute if the agency “has as a primary function intelligence, counterintelligence, investigative, or national security work,” and the statute “cannot be applied to that agency ... in a manner consistent with national security requirements and considerations.” Id. § 7103(b)(1). President Carter exercised this latter authority in Executive Order No. 12,171, 44 Fed. Reg. 66565 (Nov. 19, 1979), which stated that certain agencies satisfied the requirements of § 7103(b)(1). Id. ¶ 1-101. The Order listed AFOSI as an excluded agency. See id. ¶ 1-206(k).
This appeal concerns whether as a result of this exclusion Ptacek had no right to a union representative when being interviewed by AFOSI despite § 7114(a)(2), which states:
[The union representing employees in a unit] shall be given the opportunity to be represented at—
(B) any examination of an employee in the unit by a representative of the agency in connection with an investigation if—
(i) the employee reasonably believes that the examination may result in disciplinary action against the employee; and
(ii) the employee requests representation.
5 U.S.C. § 7114(a)(2).
C. Administrative Proceedings
The Union filed an unfair-labor-practice charge against Hill Air Force Base, asserting that Hill violated § 7114(a)(2)(B) by denying Ptacek’s request for union representation during the interview by AFOSI, which allegedly was acting as “a representative of [Hill],” 5 U.S.C. § 7114(a)(2)(B). An administrative law judge (ALJ) concluded that because Executive Order 12,-171 excluded AFOSI from coverage under the statute, AFOSI could not be a “representative” of Hill under § 7114(a)(2)(B). He found no violation of the statute and recommended that the FLRA dismiss the complaint. The FLRA agreed. See U.S. Dep’t of the Air Force, Ogden Air Logistics Ctr., Hill Air Force Base, Utah, 68 FLRA 460 (Apr. 16, 2015). The majority of the three-member panel ruled that the plain meaning of § 7103(b)(1) authorized the President to exclude AFOSI from the entirety of the statute. See id. at 462-63. They contrasted § 7103(b)(l)’s text with that of § 7103(b)(2), which authorizes the President to suspend individual provisions of the Labor-Management Statute, see id. at 462-63, and held that AFOSI was precluded from being a representative of Hill for purposes of § 7114(a)(2)(B), see id. at 464-65. We affirm, though we express the point somewhat differently. Rather than saying that AFOSI was not a “representative” of Hill, we simply hold that there was no violation of the statute because it does not apply to proper investigations by AFO-SI.
II. DISCUSSION
A. Standards of Review
We review FLRA decisions to determine “if they are arbitrary, capri *1295 cious, or an abuse of discretion or otherwise not in accordance with law.” Am. Fed’n of Gov’t Emps., AFL CIO Local 1592 v. FLRA., 288 F.3d 1238, 1240 (10th Cir. 2002) (internal quotation marks omitted). In assessing whether it properly interpreted the Labor-Management Statute, we proceed under the Chevron framework, which governs our review of “an agency’s construction of the statute which it administers.” Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We ask first whether Congress has spoken to “the precise question at issue.” Id. at 843 n.9, 104 S.Ct. 2778. If so, we must apply the unambiguous meaning of the statute. See id. If, however, the statute is ambiguous on the issue, we will defer to an agency’s reasonable interpretation. See id. at 843-44, 104 S.Ct. 2778; Nat’l Fed’n of Fed. Emps., Local 1309 v. Dep’t of Interior, 526 U.S. 86, 92, 119 S.Ct. 1003, 143 L.Ed.2d 171 (1999) (When “the [statute’s language [is] sufficiently ambiguous or open on the point,” courts must defer “to reasonable interpretation or elaboration by the agency charged with its execution.”); Am. Fed’n of Gov’t Emps., 288 F.3d at 1240 (“FLRA is entitled to considerable deference when interpreting and applying the provisions of its enabling statute.” (internal quotation marks omitted)).
This deference is justified on two grounds. First, “[u]nder Chevron, we read Congress’ silence as a delegation of authority to [the agency] to select from among reasonable options.” EPA v. EME Homer City Generation, L.P., — U.S. -, 134 S.Ct. 1584, 1604, 188 L.Ed.2d 775 (2014); see Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 381-82, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) (Scalia, J., concurring) (“[T]he general rationale for deference [is that] Congress would naturally expect that the agency would be responsible, within broad limits, for resolving ambiguities in its statutory authority or jurisdiction.”). Second, the agency has expertise on the subject. See Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. 633, 651-52, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (“[T]he judgments about the way the real world works that have gone into the [agency’s] policy are precisely the kind that agencies are better equipped to make than are courts. This practical agency expertise is one of the principal justifications behind Chevron deference.”).
In determining whether a statute is unambiguous, courts are to “employ[] traditional tools of statutory construction.” Chevron, 467 U.S. at 843 n.9, 104 S.Ct. 2778. “These tools include examination of the statute’s text, structure, purpose, history, and relationship to other statutes.” Harbert v. Healthcare Servs. Grp., Inc., 391 F.3d 1140, 1147 (10th Cir. 2004); see Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004). Even a statutory provision whose words might have multiple meanings is not necessarily ambiguous. “Ambiguity is a creature not of definitional possibilities but of statutory context.” Brown v. Gardner, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994).
Our deference to the agency’s interpretation of an ambiguous statute comes with a caveat: when an agency rests its interpretation on the erroneous view that the statute is unambiguous, we will not defer to the agency. See PDK Labs., Inc. v. DEA 362 F.3d 786, 798 (D.C. Cir. 2004) (“[D]eference to an agency’s interpretation of a statute is not appropriate when the agency wrongly believes that interpretation is compelled by Congress.” (internal quotation marks omitted)); cf. Negusie v. Holder, 555 U.S. 511, 516, 521-24, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009) (declining to defer to agency interpretation and remanding for reconsideration because *1296 agency erroneously believed its interpretation was compelled by a previous Supreme Court decision). This rule follows from Chevron’s underlying rationale. When an agency believes the statutory language leaves it no choice, it is not bringing its policy preferences or expertise to bear on the question, so the reasons for Chevron deference are not present. See Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin., 471 F.3d 1350, 1354 (D.C. Cir. 2006) (“Chevron step 2 deference is reserved for those instances when an agency recognizes that the Congress’s intent is not plain from the statute’s face. In precisely those kinds of cases, it is incumbent upon the agency not to rest simply on its parsing of the statutory language — it must bring its experience and expertise to' bear in light of competing interests at stake.” (brackets and internal quotation marks omitted)).
In this case the FLRA found the statute unambiguous. It wrote, “Because the plain wording of § 7103(b)(1) excludes AFOSI from all of the Statute’s provisions, including § 7114(a)(2), we find that AFOSI’s investigator did not act as a representative of [Hill] and, consequently, that [Hill] may not be held responsible under the Statute for the investigator’s conduct in this case.” 68 FLRA at 460. It rejected the policy concerns offered by the Union and the dissent because these concerns “must give way to the plain wording of the Statute” when, as here, AFOSI is acting within the scope of its authority. Id. at 464. In essence, it decided that its decision was compelled by Congress. See id. (“[E]ven when it seems incongruous for Congress to provide rights, but deny enforcement of those rights in particular circumstances, it is for Congress, not the [FLRA], to correct any problems arising from plain statutory wording.” (alterations and internal quotation marks omitted)).
As a result, there is no room for deference to the FLRA on this appeal. If we agree that the Labor-Management Statute is unambiguous, we will either reverse in favor of the Union or dismiss the petition, depending on our view of what the plain meaning requires. If, however, we find the statute ambiguous, we must remand to the agency to interpret the statute anew, free from its view that Congress has compelled its decision.
We now turn to interpreting the statute. After employing traditional tools of statutory interpretation, we hold that the statute clearly does not apply to AFOSI’s investigation of Ptacek.
B. The Right to a Representative— . § 7114(a)(2)(B)
The right to have a union representative present during employee disciplinary investigations has been recognized as a central component of labor law for decades. In NLRB v. J. Weingarten, Inc., 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975), the Supreme Court upheld the National Labor Relations Board’s decision that it was an unfair labor practice to deny an employee’s request for union representation at an investigatory interview that the employee reasonably believed might result in disciplinary action. Id. at 252-53, 260, 95 S.Ct. 959. The Court described the importance of such a right:
Requiring a lone employee to attend an investigatory interview which he reasonably believes may result in the imposition of discipline perpetuates the inequality the [National Labor Relations] Act was designed to eliminate, and bars recourse to the safeguards the Act provided to redress the perceived imbalance of economic power between labor and management.... The Board’s construction also gives recognition to the right when it is most useful to both employee *1297 and employer. A single employee confronted by an employer investigating whether certain conduct deserves discipline may be too fearful or inarticulate to relate accurately the incident being investigated, or too ignorant to raise extenuating factors. A knowledgeable union representative could assist the employer by eliciting favorable facts, and save the employer production time by getting to the bottom of the incident occasioning the interview. Certainly his presence need not transform the interview into an adversary contest.
Id. at 262-63, 95 S.Ct. 959 (internal quotation marks omitted). Section 7114(a)(2)(B) codifies the Weingarten right for federal employees, providing the right to union representation when requested at any examination by an employer representative that the “employee reasonably believes ... may result in disciplinary action against the employee.” 5 U.S.C. § 7114(a)(2)(B).
The Supreme Court addressed the scope of § 7114(a)(2)(B) in NASA v. FLRA, 527 U.S. 229, 119 S.Ct. 1979, 144 L.Ed.2d 258 (1999). It held that “an investigator employed in NASA’s Office of Inspector General (NASA-OIG) can be considered a ‘representative’ of NASA when examining a NASA employee, such that the right to union representation in the [Labor-Management Statute] may be invoked.” Id. at 231, 119 S.Ct. 1979. The employee, who worked at the NASA facility in Huntsville, Alabama, was suspected of threatening activities and was investigated by NASA-OIG. See id. at 231-32, 119 S.Ct. 1979. Because the employee reasonably believed that the investigation could result in his being disciplined, he requested representation by the union at the Huntsville facility. See id. at 233, 119 S.Ct. 1979. NASA and NASA-OIG argued that a “representative” of NASA could be only “a representative of agency management — ie., the entity that has a collective bargaining relationship with the employee’s union.” Id. at 233-34, 119 S.Ct. 1979 (internal quotation marks omitted). They contended that because “[n]either NASA nor NASA-OIG ha[d] such a relationship with the employee’s union[,] ... the investigator in this case could not have been a ‘representative’ of the relevant ‘entity.’ ” Id. at 234, 119 S.Ct. 1979.
The Court rejected this interpretation of § 7114(a)(2)(B) because the provision’s text was “not limited to investigations conducted by certain entities within the agency in question,” and all agreed that the relevant “agency” was NASA. Id. at 234, 119 S.Ct. 1979 (brackets and internal quotation marks omitted). It held that “[i]n common parlance, the investigators employed in NASA’s OIG are unquestionably ‘representatives’ of NASA when acting within the scope of their employment.” Id. at 240,119 S.Ct. 1979.
Although there are potentially significant differences between NASA and our ease, we will assume without deciding that AFOSI was functioning as a “representative” of Hill Air Force Base when conducting the interview of Ptacek. The question before us is the effect of § 7103(b)(1) and Executive Order 12,171 on Ptacek’s rights during that interview. We now turn to those provisions.
C. Exclusion of AFOSI under Executive Order 12,171
Despite the mandate of § 7114(a)(2)(B), the FLRA held that Pta-cek was not entitled to the presence of a union representative during his interview by the AFOSI. It relied on Executive Order 12,171, authorized by 5 U.S.C. § 7103(b)(1). We agree that the statute and executive order, read in context, unambiguously withdraw the Weingarten obligations from AFOSI investigations.
We begin with the statutory text. See King v. St. Vincent’s Hosp., 502 U.S. 215, *1298 218, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991). Section 7103(b)(1) is broad:
The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the'President determines that—
(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
(B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.
(emphasis added). The plain language excludes covered agencies from every provision under the chapter. There is no limiting language, for instance, that the agency would be subject to the provisions of § 7117 (relating to the duty to bargain in good faith) but not the provisions of § 7119 (relating to negotiation impasses). This breadth appears in sharp relief when contrasted with the narrower scope of § 7103(b)(2). Under that section the President may “issue an order suspending any provision of this chapter with respect to any agency, installation, or activity” outside the United States. 5 U.S.C. § 7103(b)(2) (emphasis added). Under § 7103(b)(2) the President can pick and choose which provisions of the Labor-Management Statute should not apply to an agency, but under § 7103(b)(1) the President must exclude it from coverage under the entire statute or not at all.
Nevertheless, there is a potential ambiguity in the statute, depending on whose perspective to adopt in construing the statute. The Union, naturally, looks at the matter from the employee’s point of view. The employee seeking to assert his Wein-garten right is not an employee of the excluded agency. He faces potential work-related discipline from his employing agency (here, Hill), not the excluded agency (here, AFOSI). Why then should his representational rights be affected by the exclusion of that other agency from the statute? As the Union puts it, “[A] covered agency [like Hill] ... does not magically become uncovered simply because it happens to choose a tool [like the AFOSI] that [may] not itself be subject to [Labor-Management Statute] liability.” Aplt. Br. at 22.
The investigator, on the other hand, is part of the excluded agency and takes it as a given that the executive order means that the statute, including § 7114(a)(2), does not apply to his actions. And that being the case, there was no violation of the Labor-Management Statute by anyone — either the AFOSI investigator or Hill Air Force Base.
To resolve this conflict, we look to the statutory structure, context, and purpose. See Brown, 513 U.S. at 118, 115 S.Ct. 552 (“Ambiguity is a creature not of definitional possibilities but of statutory context.”); Harbert, 391 F.3d at 1147 (traditional tools of statutory construction include “examination of the statute’s text, structure, purpose, history, and relationship to other statutes”). It then becomes clear that an investigator from an excluded agency does not have any Weingarten obligations when acting within the agency’s proper scope.
One strong indication that AFOSI’s perspective is the proper one is that the focus of the statutory exception and the executive order is national security. Their function is to override the interests protected by the Labor-Management Statute when required by national security. Congress recognized the importance of certain employee rights by. enacting the Labor-Management Statute. But by the same token it recognized that those rights may sometimes need to give way to national security, as determined by the President. In short, the employee’s interests are subordinate in this context.
*1299 Further supporting this view is that the Union’s interpretation would give the executive order no reasonable purpose and would undermine an important national-security purpose. To begin with, the purpose of § 7103(b)(1) and the executive order could not have been to exclude national-security investigators from the union-membership and collective-bargaining provisions of the Labor-Management Statute. Such employees are already excluded from those provisions under § 7112(b)(6), which states that a potential bargaining unit is not appropriate for labor-organization representation if it includes “any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security.” 5 U.S.C. § 7112(b)(6).
The Union argues that the exclusion could still have the purpose of exempting AFOSI employees who do not come under the § 7112(b)(6) exemption, such as clerical employees. But this purpose must satisfy the requirements of § 7103(b)(1), under which the President may exclude an agency only if the President determines that the “the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and ... the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.” (emphasis added). The Union utterly fails to explain how limiting the collective-bargaining rights of the nonexempt AFOSI employees could have been so important to this country’s national security that President Carter would decide to include AFOSI in his executive order. Nor can we think of a good reason. We note that even without the Executive Order, § 7li2(b)(6) exempts from statutory rights more than just AFO-SI’s investigators. Clerical employees may also be covered by the exemption. “[A]n employee is engaged in ‘security work’ within the meaning of [the exemption] if the employee’s duties include ‘the regular use of, or access to, classified information.’ ” U.S. Dep’t of Justice Washington, D.C., 62 F.L.R.A 286, 292 (2007). Perhaps a strike by nonexempt employees could injure national security; but federal workers are prohibited from striking anyway. See 5 U.S.C. § 7311 (“An individual may not accept or hold a position in the Government of the United States ... if he ... participates in a strike, or asserts the right to strike, against the Government of the United States....”); 18 U.S.C. § 1918 (violation of § 7311 is punishable by fíne or imprisonment for up to one year).
On the other hand, the FLRA’s interpretation of the statute has an obvious national-security purpose. Freeing AFOSI investigators from Weingarten restrictions when interviewing union members can serve two interests: (1) restricting access to national-security information that might otherwise be disclosed to union representatives attending investigatory interviews; and (2) obtaining greater cooperation in a national-security investigation from an interviewee who cannot gain psychological strength to resist by having a champion present during the interview. We recognize that there may be some (perhaps many) AFOSI interviews in which such interests are not served. But the statute does not permit the executive order to be finely tailored. The Union admitted at oral argument that under its interpretation of § 7103(b)(1) and the executive order, a Union member would always be entitled to have a representative present at an interview, no matter what the national-security interests at stake. As the Union sees it, there would be no way for the President to exclude AFOSI’s national-security interrogations from Weingarten restrictions.
This is not to say that Weingarten rights are not important. Certainly they are. But *1300 they may need to yield to national-security interests. Congress allowed for that to happen, and the President took the step. We conclude that the sole reasonable interpretation of § 7103(b)(1) and the executive order is that Weingarten rights are not available to union members during AFOSI investigations within the scope of its authority.
The relevant administrative and judicial precedents also support our interpretation. For instance, the Federal Circuit, in upholding the removal of an Air Force mechanic from his position because of marijuana usage, rejected a challenge to his questioning by the AFOSI without the presence of a union representative. See Lawson v. Dep’t of Air Force, 215 F.3d 1347, 1999 WL 594536, at *1 (Fed. Cir. Aug. 6, 1999) (unpublished). It explained, “[A]n executive order clearly exempts Air Force OSI and other investigative agencies or subdivisions from [5 U.S.C. § 7114(a)(2)(B) ].” Id. Likewise, in U.S. Dep’t of the Air Force, Air Force Materiel Command, Warner Robins Air Logistics Ctr., Robins Air Force Base, Georgia, 66 FLRA 589, 593, 596 (Jan. 12, 2011) (ALJ Decision), an ALJ held that a threat by an AFOSI investigator during an interrogation was not an unfair labor practice because “it is clear that the [AFOSI] and those working within its authority are excluded from all requirements and limitations imposed by the [Labor-Management Statute] and not just certain provisions therein. Therefore, the General Counsel’s argument that the inclusion of AFOSI in E.O. 12171 only excuses that subdivision from collective bargaining with its own employees must fail.” And in U.S. Dep’t of the Air Force, Ogden Air Logistics Ctr., Hill Air Force Base, Utah, FLRA ALJ Dec. Rep. No. 130, 1997 WL 798919, at *1 (Oct. 9, 1997), an ALJ rejected an unfair-labor-practice claim based on the refusal by AFOSI investigators to grant requests that union representatives be present for interviews. Relying on Executive Order 12,171, the ALJ held that “[AFOSI] is excluded from coverage under the [Labor-Management] Statute, ... [and] the requirements of § [7114] (a)(2)(B) may not be imposed on [AFOSI].” Id. at *8.
The Union urges that two previous FLRA' decisions support its position. See Lackland Air Force Base Exck, Lackland Air Force Base, Tex., 5 FLRA 473 (1981), and U.S. Dep’t of the Air Force, Ogden Air Logistics Ctr., Hill Air Force Base, Utah, 36 FLRA 748 (1990). True, in both decisions the FLRA held that an Air Force employee had the right to union representation under § 7114(a)(2) during an examination by an AFOSI officer. But neither decision addressed whether § 7103(b)(1) and Executive Order 12,171 exempted AFOSI from complying with § 7114(a)(2). In fact, the alleged violation in Lackland occurred on July 14, 1979, more than four months before the issuance of Executive Order 12,171 on November 19, 1979. We therefore reject the assertion by the FLRA dissenting member in this case that “[t]he only credible explanation for the positions taken — and not taken — by the parties in Lackland is that all of the parties — and the [FLRA] — understood clearly that EO 12,171 and § 7103(b)(1) were not intended to preclude the AFOSI investigator from acting as a ‘representative of the agency’ when the investigator conducted the interview.” U.S. Dep’t of the Air Force, 68 FLRA at 467 (DuBester, M., dissenting). A better explanation is that the parties understood, if they had even noted the issuance of the executive order, that it did not apply to conduct occurring before its issuance. And the later decision in Ogden Air Logistics Ctr., 36 FLRA 748, contains no mention of Executive Order 12,171 in either the FLRA decision or the ALJ decision. In our view it is not entitled to any consideration on the issue before us.
*1301 Finally, we do not address whether an AFOSI interrogation would be exempt from 5 U.S.C. § 7114(a)(2)(B) if — as the Union argues could be the result of the FLRA’s interpretation — the Air Force engaged AFOSI for routine employment disciplinary matters in order to systematically avoid the Weingarten right or if AFOSI acted outside the scope of its authority in conducting an investigation. The Union has not disputed, either before the FLRA or in the argument section of its opening brief on appeal, that AFOSI was acting within the scope of its authority in this case; and the FLRA reserved judgment on what would happen if AFOSI was operating outside the scope of that authority. See 68 FLRA at 464 (“[W]e note that there is no dispute that AFOSI was acting within the scope of its legal authority in this case, and nothing in our analysis in this case addresses situations where agencies use entities otherwise excluded from the coverage of the Statute by executive order to conduct investigations that are outside the scope of those entities’ legal authority.”). We leave the question for another day.
III. CONCLUSION
The petition is DENIED.